UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------
FRANKLIN B. BROWN,

                                        Petitioner,

                  vs.                                                9:01-CV-0233
                                                                             (TJM)(GJD)

MICHAEL MCGINNIS,

                                        Respondent.
-----------------------------------------------------------------------

**APPEARANCES:**                        **OF COUNSEL:**

FRANKLIN B. BROWN
Petitioner, *pro se*
94-B-0769
Elmira Correctional Facility
Box 500
Elmira, NY 14902-0500

ELIOT SPITZER                           TIMOTHY P. MULVEY, Esq.
Office of the Attorney General      Asst. Attorney General
State of New York
Attorney for Respondent
615 Erie Boulevard West
Suite 102
Syracuse, NY 13204

**GUSTAVE J. DIBIANCO**
**UNITED STATES MAGISTRATE JUDGE**

## REPORT-RECOMMENDATION[1]

      Petitioner Franklin Brown ("Brown" or "Petitioner") was convicted in Onondaga County Court on November 20, 1996, following a jury trial, of two counts of robbery in the first degree, grand larceny in the fourth degree, sexual abuse in the first degree, unlawful imprisonment in the first degree, and two counts of criminal possession of a weapon in the

---

      [1] This matter was referred to the Court for report-recommendation by the Honorable Thomas J. McAvoy, United States District Judge, pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rules N.D.N.Y. 72.3(c).

third degree. On January 17, 1997 Brown was sentenced as a predicate felon to an indeterminate aggregate term of 45 years to life imprisonment. Petitioner now challenges the lawfulness of his conviction pursuant to 28 U.S.C. § 2254. Dkt. No. 1 (Petition). An Order was issued pursuant to the Rules Governing Section 2254 cases in the United States District Courts, 28 U.S.C. fol. § 2254, directing service of the Petition. Dkt. No. 4. The Order further required the service of an Answer by the Respondent. *Id*. The Respondent filed an Answer and Memorandum of Law, requesting dismissal of the Petition. Dkt. Nos. 9 and 10. Respondent has included the pertinent state court records.[2] Petitioner filed a Memorandum of Law in opposition to Respondent's Answer. Dkt. No. 11.

Petitioner challenges the lawfulness of his conviction on the following grounds:

1) he was denied a fair trial when the trial court granted the state's motion and gave a missing witness charge to the jury;

2) prosecutorial misconduct; and,

3) he was denied effective assistance of trial counsel. Petition at 2-3.

Respondent seeks dismissal of the Petition on the grounds that: 1) the Petition fails to meet the standard imposed by 28 U.S.C. §2254; 2) Petitioner was not denied his constitutional right to a fair trial when the trial court gave a missing witness charge; 3) Petitioner has failed to show any prosecutorial misconduct; and, 4) Petitioner was not denied effective assistance of counsel. Dkt. Nos. 9-10.

For the following reasons, this Court recommends that the Petition be denied and dismissed.

---

[2] The state court records submitted by Respondent are listed on page 2 of the Answer.

2

# I. Background

## A. State Court Proceedings

The testimony adduced at trial revealed that on June 28, 1993 Deborah O'Grady was working at Decker's Wines and Spirits. Trial Transcript ("T") 289-290. At approximately 11:30 a.m. a customer came in and O'Grady asked if he needed assistance. He indicated he was just browsing. T. 290. The customer was a black male in his late twenties. The customer asked about the price of a bottle of champagne and O'Grady stated she would need to look it up. T. 292. She walked to the front of the store to do so. The customer came to the front of the store, went behind the desk and put a knife to O'Grady's side, told her to give him the money and not to touch any buttons. T. 290-293. O'Grady described the knife as long, with a black handle. T. 293.

O'Grady stated that the man carried a boom box, wore a blue shirt, jeans and sneakers, and that he had two gold incision teeth that she thought looked like fangs. T. 293-294. O'Grady testified that she felt the knife at her side. She gave the man the money out of the cash register. T. 294-295. The man then put O'Grady's hands behind her back and walked her to the office at the back of the store with the knife at her side. The man took O'Grady's ring, watch, and money out of her purse. T. 295-296. The man tied O'Grady up and made her lie face down on the couch in the office. T. 295-297. The man then lifted up O'Grady's dress and pulled down her pants while she pleaded for him to stop. The man said "I just want to look" and touched her buttocks area. T. 298. The man then went to get more champagne. T. 298. O'Grady heard a loud noise and got up. T. 299. When it appeared there was no one in the store she dialed 911. T. 299. When

the police arrived they took pictures of O'Grady with her feet and hands tied. T. 298-300.

On August 5, 1993 O'Grady was again working at Decker's at 5:00 p.m. T. 308. Mr. Decker was also in the back office at this time. The same man who had previously robbed the store came in and asked if they had any Wild Irish Rose. T. 309. When she recognized the man as the person who had previously robbed the store, O'Grady started to run towards the back office. T. 310. The man came up behind O'Grady and put a knife to her side. T. 311. Decker came out of the back office and the man ran towards Decker. T. 312. O'Grady ran to the back office and called 911. T. 312 - 313. The man screamed at Decker to "give him the F-ing money". The man then put the knife to Decker's neck. T. 307-312. The man took Decker to the front of the store where Decker gave him the money, and the man ran out of the store. T. 314. O'Grady identified the same man as the assailant in both robberies. T. 315. In December 1993 O'Grady and Decker picked Brown out of a line up. T. 317-318, 370-371.

During the course of the trial O'Grady, Decker, and three police officers testified during the prosecution's case, as did the owner of an adjacent business. Brown testified on his own behalf, and presented two other witnesses on his behalf; Ms. Ballard who accounted for Mr. Brown's whereabouts from 9:00 a.m. until 11:00 a.m. on June 28, 1993,[3] and Mr. Matarrese who picked Petitioner up from Crouse Hospital on June 28, 1993. Brown testified that on June 28, 1993, after he left Ms. Ballard, he went to Crouse Hospital to visit his girlfriend, Willa Hatcher, with whom he lived at that time. T. 436-437.

---

[3]There was some confusion in this testimony with Ms. Ballard testifying that Brown was in the county courthouse with her and Brown testified that he had to wait outside the courthouse because there was no place for him to lock up his bicycle.

Brown testified that he was at Crouse Hospital most of the day, past the end of visiting hours. T. 437-438. Brown testified that he only left Hatcher's room long enough to go to the emergency room to have his wrist examined.[4] T. 435-438. Brown had no recollection of his whereabouts on August 5, 1993. T. 455.

At the close of the defense case, when it was clear that Willa Hatcher was not going to be called by Brown, the prosecution made a motion for the court to give a missing witness charge.[5] The trial court permitted the parties to brief the issue, and ultimately decided to give the missing witness charge. T. 486-506.

On November 20, 1996 the jury found Petitioner guilty on all charges. Prior to sentencing, Petitioner's trial counsel made a motion for a new trial based upon allegations that Brown's alibi witness, Hatcher, had been intimidated and threatened by the prosecution and, therefore, did not cooperate in Brown's defense. After a hearing before the trial judge, Petitioner's motion was denied. On January 17, 1997, Brown was sentenced as a predicate felon to an indeterminate aggregate term of 45 years to life imprisonment. The Petitioner filed an appeal with the Appellate Division, Fourth Department, which affirmed the conviction on December 31, 1998. *People v. Brown*, 685 N.Y.S.2d 157 (4th Dept. 1998). The New York Court of Appeals denied leave to appeal on February 16, 1999. *People v. Brown,* 93 N.Y.2d 851 (1999).

---

[4] Brown testified that he fell off his bike on the way to Crouse on June 28, 1993 and injured his wrist. However, he testified that he only filled out some papers in the emergency room and then left because the wait was too long. T. 435-438, 441. The hospital records showed that Brown presented himself for treatment on June 29, 1993.

[5] Hatcher was on the defendant's witness list. T. 486-487. Hatcher was also on the Notice of Alibi submitted by Petitioner's prior counsel on March 28, 1996. Trial Exhibit 14.

On January 25, 2000 Petitioner filed a motion pursuant to New York Criminal Procedure Law §440.10(1)(h) seeking to vacate the judgment entered on November 20, 1996 based upon ineffective assistance of trial counsel. Petitioner's motion was denied on May 17, 2000. The Appellate Division, Fourth Department denied Petitioner leave to appeal on January 8, 2001.

### B. Proceedings in This Action.

Brown filed this Petition for Habeas Corpus pursuant to 28 U.S.C. §2254 on February 15, 2001. Docket No. 1. In his Petition, and Affidavit in support of the Petition (Docket No. 3), Brown first argues that the trial court's missing witness charge denied him a fair trial. Petitioner does not take issue with the substance of the charge. Rather, Petitioner asserts that there was no showing that the witness was under his control, and there was evidence that the District Attorney's Office had intimidated and coerced the missing witness (Hatcher) not to appear and testify on Petitioner's behalf. Therefore, Petitioner argues that the missing witness charge should not have been given to the jury.

Second, Petitioner asserts that the prosecutor engaged in misconduct by threatening and intimidating Hatcher, thereby keeping her from appearing to testify on behalf of Petitioner.[6]

Finally, Petitioner asserts that he was denied effective assistance of counsel

---

[6]The Court notes that the bulk of Petitioner's factual basis supporting the claim of prosecutorial misconduct to the Appellate Division related to statements made by the prosecutor in his summation, and allegations of trial "by ambush" relative to production of Petitioner's medical records and the motion for the missing witness charge. However, Petitioner's brief also mentions that "there were allegations, not fully explored by the Court below, that the trial assistant had threatened Ms. Hatcher with possible perjury charges if she testified on Appellant's behalf." *See* Appellant's Brief to the Appellate Division, page 33.

because his trial counsel did not hire an investigator, or conduct any investigation himself. In addition, Petitioner asserts that counsel failed to prepare for trial and failed to interview witnesses (Matarrese and Ballard) in advance of their trial testimony, thus undermining his mistaken identity and alibi defenses. Petitioner asserts that trial counsel failed to obtain a report by detective Vasseallo which "could have" provided exculpatory evidence, failed to notice that previous counsel had submitted an inaccurate Notice of Alibi, failed to "properly discover" composite sketches, and failed to timely subpoena Petitioner's hospital records. Docket No. 3.

## II. Discussion

### A. Standard of Review

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub.L. No. 104-132, 110 Stat. 1214 (1996), a federal court may not grant habeas relief to a state prisoner on a claim:

> that was adjudicated on the merits in State court proceedings unless the adjudication of the claim -
>
> 1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> 2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); *see also, Miranda v. Bennett*, 322 F.3d 171, 177-78 (2d Cir.2003); *Boyette v. LeFevre*, 246 F.3d 76, 88 (2d Cir. 2001). The AEDPA also requires that in any federal habeas corpus proceeding, "a determination of a factual issue made by a State

court shall be presumed to be correct [and t]he applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *see also, Boyette*, 246 F.3d at 88 (quoting § 2254(e)(1)) (internal quotations omitted). In interpreting the AEDPA, the Second Circuit has noted:

> [u]nder AEDPA, we ask three questions to determine whether a federal court may grant habeas relief: 1) Was the principle of Supreme Court case law relied upon in the habeas petition "clearly established" when the state court ruled? 2) If so, was the state court's decision "contrary to" that established Supreme Court precedent? 3) If not, did the state court's decision constitute an "unreasonable application" of that principle?

*Williams v. Artuz*, 237 F.3d 147, 152 (2d Cir. 2001) (citing *Williams and Francis S. v. Stone*, 221 F.3d 100, 108-09 (2d Cir. 2000)).  A state court's decision is "contrary to" established Supreme Court precedent if it applies a rule that contradicts Supreme Court precedent, or decides a case differently than the Supreme Court on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000).  Moreover, a federal court is not to consider whether the state court's determination was merely incorrect or erroneous, but instead whether it was "objectively unreasonable."  *Williams*, 529 U.S. at 409; *see also, Sellan v. Kuhlman*, 261 F.3d 303, 315 (2d Cir. 2001); *Valtin v. Hollins*, 248 F.Supp.2d 311, 314 (S.D.N.Y. 2003).  The Second Circuit has noted that this inquiry admits of "[s]ome increment of incorrectness beyond error", though "the increment need not be great [.]" *Francis S.*, 221 F.3d at 111.

In order to apply the AEDPA standard, the petitioner's claims must have been "adjudicated on the merits" in the State court proceedings.  28 U.S.C. §2254(d)(1). The Second Circuit has held that a State court adjudicates a petitioner's federal

8

constitutional claim on the merits if it "(1) disposes of the claim 'on the merits.' and (2) reduces its disposition to judgment." *Sellan v. Kuhlman*, 261 F.3d 303, 312 (2d Cir. 2001), *cited in Brown v. Artuz*, 283 F.3d 492, 498 (2d Cir. 2002). In making this determination, the court considers: "(1) what the state courts have done in similar cases; (2) whether the history of the case suggests that the state court was aware of any grounds for not adjudicating the case on the merits; and (3) whether the state court's opinion suggests reliance upon procedural grounds rather than a determination on the merits." *Id.* (quotation omitted).

The court in *Brown* further stated that the habeas court gives a broad reading to state court dispositions, and the state court need only have decided petitioner's federal claim on substantive grounds and reduced the decision to judgment. *Brown v. Artuz, 283 F.3d at 498.* The state court need not articulate its rationale further*. Id.* (*citing Aparicio v. Artuz,* 269 F.3d 78, 93-94 (2d Cir. 2001))*.* The state court need not mention the argument raised by petitioner or cite to any relevant case law in order for its ruling to be considered "an adjudication on the merits." *Id.* In this case, the Appellate Division considered Petitioner's claims on the merits.

### B. Denial of Right to a Fair Trial

Petitioner alleges that he was denied a fair trial when the Court granted the state's motion for a missing witness charge with respect to Willa Hatcher. Hatcher, who appeared on Petitioner's witness list and his Alibi Notice, is the person Brown testified that he spent most of the day with on June 28, 1993, the date of the first robbery. She is the woman Petitioner was living with at the time the robberies occurred. At the close of the

9

defense case, when it became apparent that Brown was not going to call Hatcher, the prosecution requested that the Court give a missing witness instruction to the jury. That motion was granted. In his closing argument, Petitioner's counsel took the opportunity to address the jury regarding Hatcher's absence, and the inference that would be addressed in the missing witness charge. Brown's counsel also offered a number of plausible explanations for Hatcher's absence to the jury. T. 516-518.

Petitioner does not take issue with the substance of the jury charge. Rather, he asserts that there was no evidence showing that the witness was under his control. Further, Petitioner argues that there was evidence that the District Attorney's Office had intimidated or coerced Hatcher not to appear and testify on Petitioner's behalf.[7] Accordingly, Petitioner argues that it is improper to permit an adverse inference be drawn from his failure to produce this particular witness.

### i. Clearly Established Supreme Court Precedent

The burden of demonstrating that an erroneous instruction was so prejudicial that it will support a collateral attack on the constitutional validity of a state court's judgment is even greater than the showing required to establish plain error on direct appeal." *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977). "To overturn a state court conviction based on an improper jury instruction, a federal court must establish "not merely that the instruction is undesirable, erroneous, or even 'universally condemned,' but that it violated some right which was guaranteed to the defendant by the Fourteenth Amendment." *Cupp v. Naughten,* 414 U.S. 141, 146 (1973). "A single instruction to a jury may not be judged

---

[7]The allegations of coercion and intimidation were raised in a post-trial motion filed by Petitioner's trial counsel.

in artificial isolation, but must be viewed in the context of the overall charge. *Id.* at 146-147 *citing Boyd v. United States*, 271 U.S. 104, 107 (1926).

**ii. Contrary to, or Unreasonable Application of, Supreme Court Precedent**

Under New York law, the party requesting the "missing witness charge must demonstrate that the uncalled witness is knowledgeable about a material issue upon which the evidence is already in the case; that the witness would naturally be expected to provide noncummulative testimony favorable to the party who has not called him, and that the witness is available to such party." *Jones v. Spitzer*, 2003 WL 1563780, *39 (S.D.N.Y. 2003). "The decision whether to give the missing witness charge is committed to the sound discretion of the trial court." *Id.* at *39.

Petitioner argues that there was no evidence that Hatcher was under his control. Further, Petitioner argues that there was evidence that the District Attorney's Office had threatened or intimidated Hatcher to keep her from testifying. With respect to the initial determination to give the instruction, the Court notes that the trial court required the parties to brief the question and present any proof they had to offer. T. 485-506. The same was done with respect to the post-judgment motion for a new trial. In both instances, the trial court found that the arguments Petitioner now puts forth were factually and legally unsupported. With respect to the factual determination, it is presumed correct unless rebutted by clear and convincing evidence. 28 U.S.C. §2254(e)(1). No such evidence has been presented to this Court.

The Court has also reviewed the instruction at issue.[8] It is clearly an instruction

---

[8]The trial court stated to the jury "However, from the failure of the defense to call Willa Hatcher as a witness, the law permits, but does not require, you to infer, if you

11

with respect to a permissive inference. As some courts have noted, "... a missing witness instruction is merely a more formal articulation of an inference which a jury may draw or not draw on the basis of their ordinary experience." *Green v. Scully*, 840 F. Supp 254, 256 (S.D.N.Y. 1993) *citing United States v. Nichols*, 912 F.2d 598, 601 (2d Cir. 1990). Moreover, it is well established that the permissive nature of the instruction does not deprive Petitioner of his presumption of innocence or other elements of due process because the fact finder remains free to accept or reject the inference. *County Court of Ulster County v. Allen*, 442 U.S. 140 (1979); *Niziolek v. Ashe*, 694 F.2d 282 (1st Cir. 1982); *Boxill v. Kirk*, 1987 WL 20311 (E.D.N.Y. 1987). Finally, in light of the substantial evidence presented at trial implicating Brown in the crimes of which he was convicted, his conviction on the charges appears to this Court to have been certain absent the complained of instruction.

### C. Prosecutorial Misconduct.

**i. Clearly Established Supreme Court Precedent**

A criminal defendant's right to a fair trial is mandated by the United States Constitution. *Albright v. Oliver*, 510 U.S. 266, 273 n.6 (1994) *(citing United States v. Agurs*, 427 U.S. 97, 107 (1976)). For a prosecutor's misconduct to rise to the level of a constitutional violation, the misconduct "must be of sufficient significance to result in the denial of the defendant's right to a fair trial." *Greer v. Miller*, 483 U.S. 756, 765 (1987)

---

believe it proper to do so, that if Willa Hatcher had been called as a witness by the defendant and testified, her testimony would not have supported the testimony of the defendant on that issue. You may infer so only if you are satisfied that Willa Hatcher was under the control of the defendant and was available to be called by the defendant , if he had wished to do so. T. 607.

12

(internal quotations and citations omitted). Thus, for habeas relief to be granted based upon a claim of prosecutorial misconduct, the alleged misconduct must have "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). "Prosecutorial misconduct does not amount to a denial of the right to a fair trial unless Petitioner shows a 'reasonable probability' of a different result absent the alleged misconduct." *Metts v. Miller,* 995 F. Supp. 283, 297 (E.D.N.Y. 1997) (*citing Kyles v. Whitley,* 514 U.S. 419, 434 (1995)). In considering such a claim, courts are to focus on "the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219 (1982).

**ii.  Contrary to, or Unreasonable Application of, Supreme Court Precedent**

The issue of the alleged intimidation of Hatcher was first raised on a post-conviction motion dated December 31, 1996 which is supported primarily by the statement of Andrea Ballard. Ballard's December 30, 1996 Affidavit states she spoke with Hatcher and inquired why she did not appear and testify on behalf of Brown. Ballard states that Hatcher responded that she received a call from the district attorney's office who advised her that "if you do give testimony at the trial and you lie you will be charged with perjury." An Affidavit from investigator Spadafore, who was hired by Brown's trial counsel, was also offered in support of the motion. Spadafore states that on December 11, 1996 he spoke with someone over an intercom who identified herself as Willa Hatcher. That person told Spadafore that "I know nothing about his case and that she got probation because of him (Mr. Brown) and her probation officer said for her not to talk with anyone about Franklin

13

Brown[9] ... and she wants to be left alone and for people to stop calling her apartment and coming by ..."

In response to the motion, the prosecutor submitted an Affidavit in which he stated that he had been assigned all three of defendant's cases for prosecution. Because Hatcher was anticipated to be a grand jury witness in the unindicted robbery case an investigator made telephone contact with her on March 14, 1996, asking her to call the district attorney. Hatcher complied with that request. On March 28, 1996 Brown's original trial counsel (Mr. Falco) first notified the District Attorney's Office of his intent to call Hatcher as an alibi witness. Assistant District Attorney Cuffy stated that approximately one week prior to the trial on the charges giving rise to this action he spoke with Hatcher and advised her that she was listed as an alibi witness. Hatcher stated she would not cooperate. Cuffy states that he told her "that she must cooperate if she received a

---

[9]The Court notes that at the *Sandoval* hearing the prosecutor raised the issue of Hatcher's history and probation, due to her being on the witness list. In light of this colloquy, it is plausible that trial counsel did not subpoena Hatcher for strategic reasons.

MR. CUFFY: Willa Hatcher is currently on probation for a charge in which she used a stolen ATM card. This defendant has an open robbery count which is unindicted this far. She can be charged with robbery. That charge that Willa Hatcher is on probation for is related to that robbery.
THE COURT: ... so if Mr. O'Rourke puts Miss Hatcher on and you want to cross-examine Miss Hatcher, too, for the credibility, I can see you asking, if fact, you are on probation for a stolen credit card? Yes. And isn't it a fact that you got probation for a robbery committed by this defendant? You know this defendant?
MR. CUFFY: Right.
MR. O'ROURKE: Judge, I guess her history is whatever her history is, and it affects her credibility however the jury determines.
THE COURT: But it may dirty your client if you put it on the stand, because what counsel has alleged right now is that that credit card came from an allegation where your client robbed somebody and took it. And he and Miss Hatcher have this relationship, and he thinks that's fair game. And I have to agree with him, sir.
MR. O'ROURKE:   We understand that, judge. T.16-17

14

subpoena. At no point was Ms. Hatcher threatened or told not to cooperate with the defendant. In fact, she was encouraged to cooperate if subpoenaed." It is undisputed that no subpoena was ever issued for Hatcher. Petitioner's Motion for a new trial based upon this alleged prosecutorial misconduct was denied.[10]

As to the factual findings of the trial court, because they are not set out in a written decision or transcript which is before this Court, this Court will not speculate. However, based upon the Affidavits before this Court, there does not appear to be any evidence of prosecutorial misconduct, and certainly no indication that the state court's denial of the motion was objectively unreasonable. Nor has Petitioner demonstrated any taint to his trial based upon the actions of the prosecutor. Hatcher was not subpoenaed. As discussed above, in light of Hatcher's legal history that decision may have been a strategic decision by trial counsel that this Court will not second guess. Regardless, Petitioner has offered this Court nothing to suggest that, absent the actions of the prosecutor, the result of his trial would have ended with a different result. Accordingly, this claim is without merit.

**E. Ineffective Assistance of Counsel**

The final claim raised is that Petitioner's trial counsel was ineffective because counsel (1) did not hire an investigator, or conduct any investigation himself, (2) failed to prepare for trial and failed to interview witnesses Matarrese and Ballard in advance of their trial testimony, (3) failed to obtain a report by detective Vasseallo which "could have"

---

[10] The Court notes that no transcript from the argument on this motion, or written decision on the motion, is contained in the record provided to this Court. Only the Motion, supporting Affidavits, and Affidavits in Opposition to the Motion were provided to this Court.

15

provided exculpatory evidence, (4) failed to notice that previous counsel had submitted an inaccurate Notice of Alibi, (5) failed to "properly discover" composite sketches, and (6) failed to timely subpoena Petitioner's hospital records. Docket No. 3.

**i. Clearly Established Supreme Court Precedent**

To establish ineffective assistance of counsel, a Petitioner must show both (1) that his counsel's representation fell below an objective standard of reasonableness, measured in light of the prevailing professional norms, and (2) resulting prejudice - that is, a reasonable probability that, but for counsel's performance, the outcome of the proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668, 688-90 (1984); *see also Aeid v. Bennett*, 296 F.3d 58, 62-63 (2d Cir. 2002).[11] In other words Petitioner must demonstrate that his counsel's performance was deficient and absent the deficient performance the trial outcome would have been different. *Rosario v. Bennett*, No. 01 Civ. 7142, 2002 WL 31852827, at * 27 (S.D.N.Y. Dec. 20, 2002) (citing *Strickland*, 466 U.S. at 687 and 694).

**ii. Contrary to, or Unreasonable Application of, Supreme Court Precedent**

Brown contends that his legal representation was deficient because his counsel failed to adequately investigate his case or interview witnesses. Petitioner alleges that counsel should have spoken with witnesses whose names Petitioner provided to counsel. However, Petitioner never alleges who these witnesses were, what, if any, information would have been learned from these witnesses, or how their testimony would have

---

[11] In *Williams v. Taylor*, 529 U.S. 362 (2000), the Supreme Court declared that "the rule set forth in *Strickland* qualifies as "clearly established Federal law[.]" *Williams*, 529 U.S. at 391.

16

changed the outcome of his trial. In addition, Petitioner claims that counsel failed to speak with Ballard and Matarese prior to their testimony. In this regard, Petitioner states that he is "not inferring that had [counsel] interviewed the witnesses prior to trial, he would have changed their testimony. However, based on the fact that the incident was more than three years old...." counsel should have spoken with them to "make a professional judgment on the facts." Petitioner also alleges that counsel failed to investigate Petitioner's mistaken identity and alibi defense, but does not allege what investigation counsel failed to undertake, what leads counsel should have investigated, or what evidence could have been discovered upon further investigation. Petitioner also alleges that a police report written by detective Vasseallo could have contained information that, if investigated, would have been favorable to presenting the mistaken identity defense. However, Petitioner offers nothing more in this regard other than this conclusory allegation. Finally, Petitioner alleges that counsel failed to discover composite sketches, but does not allege what, if any, use could have been made of such sketches or how they would have altered the outcome of his trial.

Petitioner does not identify specific evidence that, if uncovered, might have led to a different outcome at his trial. A claim of ineffective assistance of counsel based upon failure to investigate or interview witnesses fails when the allegations are conclusory and do not show what evidence could have been uncovered leading to a different trial outcome. *Madarkin v. U.S.*, No. 95 Civ. 2052, 1997 WL 597085, at *1 (E.D.N.Y. Sept. 24, 1997); *see also, e.g., Polanco v. U.S.*, 99 Civ.5739, 2000 WL 1072303, at *10 (S.D.N.Y. Aug. 3, 2000)(failure to investigate claim not sufficient because petitioner "does not say precisely what counsel would have learned or how counsel would have learned it");

17

*Rosario*, 2002 WL 31852827, at *33 ("petitioner may not merely allege that certain unidentified witnesses 'might' have supplied relevant testimony, but must state exactly what testimony they would have supplied and how such testimony would have changed the result"). Petitioner's conclusory allegations that his counsel failed to adequately investigate his case or interview witnesses do not satisfy either prong of the *Strickland* test.

Petitioner also alleges that his counsel was ineffective because he failed to discover an error in a Notice of Alibi submitted by Petitioner's prior attorney, and because he failed to timely subpoena Petitioner's medical records. With respect to the Notice of Alibi, there is no indication in the record that Petitioner's prior counsel had provided trial counsel with a copy of that notice. Moreover, Petitioner had an opportunity to tell the jury that the notice had been filed by his prior counsel[12], and also had an opportunity to testify as to the correct information, as did his alibi witness. As to the medical records, they were scheduled to be delivered to the Court at the time counsel anticipated he would need them. In addition, a second copy of those records was available to the Court as a result of a subpoena issued by the prosecution. Moreover, the hospital records did not support Petitioner's contention that he received treatment on the day of the first robbery in June, 1993.[13] Petitioner offered the Court nothing to substantiate that such alleged errors by trial

---

[12]Petitioner testified that "Mr. Falco, obviously, made a whole lot of errors. That's why he is not my attorney any more." T. 454.

[13]The Court notes that in his opening statement, Petitioner's counsel referred to Petitioner's visit to the emergency room on the day of the robbery, apparently in reliance upon what Petitioner had communicated to him. T. 286. It was not until a mid-day recess in the trial when counsel learned that Petitioner's medical records reflected that Petitioner had actually been treated on the following day. However, this information came to light

counsel amount to conduct that falls below an objective standard of professional care. Further, Petitioner has offered no allegation as to how the outcome of his trial would have been different absent these alleged errors. Thus, Petitioner's conclusory allegations do not satisfy either prong of the *Strickland* test.

**WHEREFORE,** based on the findings above, it is

**RECOMMENDED**, that the Petition be **DENIED and DISMISSED.**

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW**. *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993)(citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).

Dated: April 8, 2005

_____
Hon. Gustave J. DiBianco
U.S. Magistrate Judge

---

prior to Petitioner's testimony, and Petitioner testified as to the reason there was no entry in his records on June 28, 1993. T. 439-443.